## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW HAMPSHIRE

William Edmondson


     v.                                    Civil No. 05-cv-445-JD


Stephen J. Curry, Commissioner,
New Hampshire Department of
Corrections, et al.


### REPORT AND RECOMMENDATION


    Before the Court is William Edmondson's motion for an
emergency preliminary injunction (document no. 7) and the
Defendant's objection (document no. 14).  This matter was
referred to me to review and to prepare a report and
recommendation (document no. 8).[1]  The Court held an evidentiary
hearing on February 23 and 24, 2006.  For the reasons discussed
herein, I recommend that the District Judge deny Edmondson's
motion for preliminary relief.

    At the preliminary injunction hearing, the Court heard
testimony from the following witnesses: Plaintiff William
Edmondson, Harold McAllister, a New Hampshire State Prison

---

    [1]Simultaneously with this Report and Recommendation, I have
issued an Order directing service of the complaint on the named
defendants.

("NHSP") social worker and inmate counselor, Stephen Nelson, a corrections counselor and case manager at the NHSP, Robert McGrath, a corrections counsel and case manager at the NHSP, Judith Mann, a Sex Offender Program ("SOP") therapist, Ruth Kevghas, an SOP therapist, Gary Fecteau, an inmate facilitator in the SOP, Edward Redmond, a social worker and Edmondson's therapist at NHSP, Kimberly Marsh, an SOP therapist, Norman Smith, an SOP therapist and administrator, and Keith Saunders, a corrections counselor and case manager at the SOP.  After considering the testimony of all the witnesses, I discuss the facts relevant to the request for preliminary relief below.

<u>Background</u>

Edmondson was accepted into the SOP at the NHSP in November of 2003.  On December 1, 2003, Edmondson signed a Program Contract, agreeing to the rules and regulations governing the SOP.  <u>See</u> Def. Ex. F.  As part of the contract, Edmondson agreed to, among other things:

> [B]e completely open and honest and assume full
> responsibility for my offenses and my behavior, [and]
> not disclose any information regarding another client to
> anyone outside this program unless an appropriate
> authority requires the information in an emergency.
> This includes not revealing the identity of any group
> member.

Id.  Over the course of Edmondson's first fifteen months in the program, he successfully completed most of the SOP course work. In early March of 2005, Edmondson was subpoenaed to testify in a lawsuit filed in this Court by another inmate, Randy Duquette ("Duquette lawsuit").  The Duquette lawsuit challenged the SOP's practice of including religious and spiritual materials in the program as violative of the Free Establishment Clause o the First Amendment.  Edmondson was called to testify to the existence of religious and spiritual content in the SOP program materials.  Edmondson alleges that as a result of his testimony in the March 2005 hearing, and another hearing in the Duquette lawsuit, the SOP staff members and inmate facilitators engaged in a practice of harassment against him, including verbal bullying, sanctions within the program, and ultimately termination from the SOP.

Edmondson also testified that at the end of April 2005, another inmate asked him to look into a darkened room to determine whether or not anything suspicious was occurring inside.  In the room, Edmondson saw two inmates in the SOP sitting very close to one another.  Edmondson suspected that the two inmates were engaging in sexual activity.  Shortly

thereafter, a non–SOP inmate who is a friend of Edmondson's, Steven Roy, told Edmondson that the same two inmates had engaged in sexual contact in the furniture shop.  Edmondson testified at the hearing that he was unsure of what to do with this information, as a failure to report a breach of program rules, such as engaging in sexual activity with another inmate, is itself a breach of program rules.  Edmondson consulted both an inmate facilitator and a member of his inmate support team as to what course of action he should take.  Gary Fecteau, an inmate facilitator in the SOP, testified that Edmondson had acted appropriately in seeking out these members of the therapeutic community for guidance as to how to act in a difficult situation. He was advised by the inmates to report the incident to SOP staff and he did so.  According to Edmondson, these two inmates were the only people he told about what he had seen.  SOP staff members who testified at the hearing, however, testified that they had heard the information from other inmates who reported that Edmondson was the source of the information.

Inmates participating in the SOP are prohibited from engaging in sexual contact with other inmates.  If the inmates that Edmondson observed were found to have engaged in sexual

contact, that would be a major rule violation that could cause them to be terminated from the SOP.  For this reason, the SOP staff testified that they took Edmondson's allegations seriously and that they thoroughly investigated the incident.  They did this by first determining whether the suspected inmates' schedules allowed for them both to be in the furniture shop at the same time, which it did not.  Additionally, both of the suspected inmates were given polygraph examinations, which they "passed," indicating to the SOP staff that they had not engaged in the conduct of which they were accused.

On May 3, 2005, Edmondson approached an inmate in the chow hall who had just been talking with one of the inmates suspected of engaging in sexual contact, and asked if the suspected inmate had passed the polygraph.  The inmate who Edmondson approached reported to SOP staff that Edmondson had raised this issue in the chow hall outside of the SOP unit, and that Edmondson was loud enough to be overheard by other inmates.  Edmondson subsequently admitted to staff that he discussed this matter outside of the SOP.

According to the testimony of Gary Fecteau, which I find credible, during the several weeks following Edmondson's sexual

contact accusations, tensions began to mount in the SOP.  In what Fecteau referred to as the "inmate rumor mill," there was much discussion inside and outside of the SOP that the Duquette lawsuit was going to close down the SOP.  Some inmates also began to believe that as a result, all of the inmates in the program were going to be forced to serve their maximum sentences.  Over time, the rumors became specific and believable, and Edmondson was commonly identified as being not only part of the problem due to his participation in the Duquette lawsuit, but as someone who could not be trusted with information, due to his reputation for rumor mongering and violating confidentiality.  Whether or not Edmondson was actually engaged in rumor mongering is a matter of dispute.  Edmondson insists that he was not, while SOP staff members identified him as a source of mistrust and distress on the part of many of the SOP inmates.

Fecteau and SOP staff members testified that the mistrust of Edmondson and the rumors circulating in the SOP were interfering with the treatment the SOP inmates were receiving.  Accordingly, in response to the SOP community's growing concerns, the SOP staff held a Town Meeting.  At that town meeting, inmates were invited to express how Edmondson's actions had made them feel.

SOP therapist Judy Mann testified that all of the inmates'
comments to Edmondson were made in the "I mode" in that the
inmates described only their own feelings.  Mann and other SOP
staff members described the Town Meeting as uncomfortable for
Edmondson, but not abusive in any way.  Fecteau testified that he
was sitting beside Edmondson at the meeting, and that it was an
intensive hour and forty-five minutes of inmates confronting
Edmondson with what they perceived to be his inappropriate or
maladaptive behavior.  Fecteau testified that while the meeting
was conducted in a constructive manner, that it was a very
difficult experience for Edmondson.  Fecteau testified that he
spent two hours after the meeting working with Edmondson to help
him recover from the meeting which Edmondson has described as a
"verbal bashing."  Edmondson continued to try to work through his
anger at being subjected to the inmates' wrath at the Town
Meeting in his treatment groups during the next several weeks.

At the end of June 2005, Edmondson received a "pull-up,"
which is an unofficial and inmate-initiated disciplinary action
that occurs within the SOP to hold inmates accountable for their
behaviors.  The pull-up concerned Edmondson's flicking one of his
cellmates on the chest, in the nipple area, in order to inflict

pain on that inmate because he wanted the inmate to get out of
his way.  Edmondson's treatment group took the pull-up very
seriously because of the aggressive nature of the action and
because it involved a sexual area of his cellmate's body.
Edmondson was reluctant to take full responsibility for his
actions, blaming the pull-up on the fact that he had given
another inmate a pull-up earlier that day, and that he and his
cellmates had an agreement not to give each other pull-ups for
minor matters, so that this never should have arisen, and
generally minimizing the incident.

On July 1, 2005, Edmondson was "placed on contract."  Being
placed on contract is essentially being given notice, in writing,
that you have violated serious rules of the SOP and that any
further violation of program rules, or the instructions in the
contract will result in termination from the program.  The
contract document indicated the following reasons for Edmondson
being placed on contract:

    1.  Aggressive behaviors for flicking his cellmate's nipple
        to inflict pain, spreading a "malicious rumor about two
        community members being caught in mutual masturbation
        which could have resulted in them losing their
        program,"[2] and direct and indirect threats in group to

_____

    [2]At the hearing, the SOP staff members testified that they
treated this incident as though Edmondson had spread false rumors

report his therapist's behavior to a federal judge if
he didn't get his way;[3]

2.    Failure to accept responsibility for his behavior
      by victim stancing for blaming his behavior on his
      past abuse history, his ill health or other
      community members; and

3.    Holding resentments and then retaliating against
      inmates Edmondson perceived to have wronged him in
      the past.

When Edmondson was placed on contract, he had already completed

all of the work at the SOP program except preparing his

maintenance contract for approval.  A maintenance contract is a

contract an SOP graduate lives by outside of the program to

prevent relapse and maladaptive behaviors from occurring.

On July 19, 2005, Edmondson, was overheard telling a former

about the inmates involved.  Edmondson testified that while he
understood the inmates in question had been officially
exonerated, he does not doubt that the sexual contact occurred,
that he spoke with two inmates to get guidance on what to do, and
that he reported the incident to staff.  Edmondson denies telling
any other inmate about the incident.  While I find that the
investigation conducted by the SOP staff does not disprove
Edmondson's version of events, Edmondson's truthfulness or lack
thereof on this matter is not germaine to my recommendation on
this motion, as I find that the termination was not based on
having made the accusation, but on Edmondson's violation of the
SOP confidentiality rules.

[3]Edmondson denied threatening the SOP staff in this manner.
Because the determination of this issue does not have any bearing
on my recommendation on the motion at issue, I will not discuss
these matters further.

SOP inmate that two inmates in the SOP had been terminated from the program for engaging in sexual conduct.[4]  That conversation occurred while Edmondson was walking to the chow hall.  The SOP staff met and determined that Edmondson had committed another violation of the SOP's confidentiality rules.  In both the incident where Edmondson witnessed two inmates having sexual contact and in the incident where he told another inmate that two inmates had been terminated, he was outside of the SOP unit where he could be overheard, and was therefore in violation of SOP confidentiality rules.  The testimony at the hearing made clear that there is some ambiguity in the confidentiality rules.  There is no question in my mind, however, that Edmondson understood that discussing any confidential matters with anyone outside of the SOP unit where he could be overheard violated the SOP's rules.

Edmondson's written notice of termination cited the following reasons for his termination: repeated breaches of confidentiality, that other SOP community members felt mistrustful of Edmondson and his ability to maintain their confidences, and that his behavior therefore negatively impacted

---

[4]This incident was not related to the April incident in which Edmondson reported sexual contact between two inmates.

the community, that he constantly threatened legal action when held accountable for his behavior, and that he created dissension between staff and community members for his own self-interest. For all of these reasons, Edmondson was terminated from the program. Edmondson was given permission to reapply to the program after a period of six months passed.

In November of 2005, Edmondson was eligible to be considered for parole. He was denied parole because he had not completed the SOP. He was told that he could reapply for parole after he completed the program. SOP therapist and administrator Norman Smith testified at the hearing that two to three previously terminated inmates are readmitted to the SOP each quarter, and that while Edmondson had reapplied, he was currently in either the twenties or thirties on the waiting list. Smith acknowledged that Edmondson was likely to have to wait at least two and a half years for readmission to the program, and that he could possibly spend five years or more on the waiting list before being readmitted.

Edmondson alleges that the treatment he received was made in retaliation for his involvement in the Duquette lawsuit which was critical of the SOP and resulted in program changes in the SOP.

11

The SOP staff responded that the in-program consequences to which Edmondson was subjected, as well as the contract he was placed on and ultimately his termination from the SOP, were based on his behaviors in the program and denied that any actions were taken against Edmondson in retaliation for his participation in the Duquette lawsuit.

Edmondson's therapist, Edward Redmond, testified that Edmondson sometimes misperceived reality, that he viewed the world as a place that victimized him, that he is a very suspicious person in that he believes he is perceived and talked about by others in a negative way, and that his psychiatric diagnosis causes him to mistrust others.

<u>Discussion</u>

A district court may grant a plaintiff's request for a preliminary injunction if the plaintiff satisfies a four-part test: (1) the plaintiff is likely to succeed on the merits of the action; (2) the plaintiff will suffer irreparable harm if the injunction is not granted; (3) the injury to the plaintiff outweighs any harm which granting the injunction would inflict on the defendant; and (4) the public interest will not be adversely affected by the granting of the injunction.  See <u>Langlois v.</u>

<u>Abington Hous. Auth.</u>, 207 F.3d 43, 47 (1st Cir. 2000).  A party seeking injunctive relief must independently satisfy each of the four factors.  <u>See</u> <u>Auburn News Co. v. Providence Journal Co.</u>, 659 F.2d 273, 277 (1st Cir. 1981).

Edmondson alleges that he was terminated from the SOP in retaliation for his assertion of his First Amendment right to not be forced to exercise any particular religious practice and his participation in the Duquette lawsuit.  Edmondson seeks an order forbidding prison staff from retaliating against the plaintiff in any way, including by discussing this litigation with anyone other than their counsel, and an order directing the SOP staff to immediately deem Edmondson "graduated" from the SOP program, to provide him with documentation of his completion of the SOP sufficient to satisfy the parole board, and, if necessary, to provide him one-on-one counseling to help him finish his maintenance contract.

I.   <u>Likelihood of Success on the Merits</u>

    A.   <u>Free Establishment Claim</u>

The Establishment Clause of the First Amendment to the United States Constitution prohibits the government from coercing anyone to support or participate in religion or its exercise.

13

<u>Lee v. Weisman</u>, 505 U.S. 577, 587 (1992).  The provisions of the First Amendment are made applicable to the states through the Fourteenth Amendment.

> [T]he type of coercion that violates the Establishment Clause need not involve either the forcible subjection of a person to religious exercises or the conditioning of relief from punishment on attendance at church services. . . . Coercion is also impermissible when it takes the form of subtle coercive pressure that interferes with an individual's real choice about whether to participate in worship or prayer.

<u>DeStefano v. Emergency Hous. Group, Inc.</u>, 247 F.3d 397, 412 (2d Cir. 2001) (internal citations omitted); <u>see</u> <u>Rutan v. Republican Party of Ill.</u>, 497 U.S. 62, 77-78 (1990) ("What the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly."). Conditioning parole eligibility or risk status on attendance at a faith-based rehabilitation program constitutes coerced religious involvement.  <u>Kerr v. Farrey</u>, 95 F.3d 472, 480 (7th Cir. 1996).

Edmondson has alleged that as a participant in the SOP, he was forced to use materials that were religious or faith-based. Edmondson alleges that the SOP programming involved scriptural quotes being posted in public places, a twelve-step program that utilized the idea of a "higher power," and prayer.  Edmondson further alleges that his participation in and completion of the

14

SOP is essential to his being granted parole.

The SOP staff witnesses who testified at the hearing agreed that a number of the materials to which Edmondson objects were in use in the SOP program until June of 2004, a full six months after Edmondson started the program.  Further, the SOP staff witnesses testified that while there was no public prayer as part of the program, there was a daily quote posted by an inmate in a public area, which was often a quote taken from a religious text. The daily quote is part of the SOP program and while the staff claimed that the inmates chose what source to use as a quote, they acknowledged that the quote was placed in a public area for the use of all of the SOP participants.  I find that there is no substantive difference between posting a scriptural quote on a public board and hanging a crucifix on the wall.  Although the SOP staff claim that inmates were responsible for choosing the quotes from a religious text, I find that the state, through its management of the SOP, is responsible for incorporating religion into the SOP program by means of a public display visible to SOP participants who do not choose to practice that religion.  While SOP staff have provided the participants with a warning when materials contain references to religion or spirituality, and

have claimed to provide inmates with the option to forego such
programming, the posting in a public place of religious
quotations subjects SOP inmates to a particular religion as part
of a state-run program.  Because these facts were admitted by the
SOP staff witnesses, I find that Edmondson has demonstrated that
he is likely to succeed on the merits of his Free Establishment
Clause claim.  Since Edmondson is not currently in the SOP
program, however, and is therefore not currently having to use
program materials provided by the SOP, he has no current need for
an injunction with regard to his free exercise claim.

      B.    <u>Retaliation Claim</u>

    "[A]n otherwise legitimate and constitutional government act
can become unconstitutional when an individual demonstrates that
it was undertaken in retaliation for his exercise of First
Amendment speech."  <u>Anderson v. Davila</u>, 125 F.3d 148, 161 (3d
Cir. 1997).  A cognizable retaliation claim has three elements:
(1) the plaintiff engaged in protected conduct; (2) an adverse
action was taken against the plaintiff that would deter a person
of ordinary firmness from continuing to engage in that conduct;
and (3) there is a causal connection between the plaintiff's
protected conduct and the defendant's adverse action.  <u>See</u>

16

Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999); see also Shabazz v. Cole, 69 F.Supp.2d 177, 197 (D.Mass. 1999)..

As to these three elements, the first is not in dispute, as the Defendants stated in their objection to the preliminary injunction: "Defendants do not dispute that plaintiff has a right to voice his aversion to any alleged religious based indoctrination, associate with a person litigating the issue or testify about his experiences in the SOP."  Def. Obj. to Pltf.'s Mot. for Emerg. Prel. Inj. ¶ 5.  The Defendants further concede that a significant adverse action was taken against the plaintiff in that he was placed on contract and ultimately terminated from the SOP.  Id.  Defendants argue, however, that the adverse action was not taken to deter Edmondson's participation in protected conduct.  They deny that there was any causal connection between the plaintiff's protected conduct and the adverse actions cited. Id.  Defendants claim that Edmondson's behavior in twice violating confidentiality, acting in a physically aggressive manner toward his cellmate, and other maladaptive behaviors that the SOP staff members testified to were the reason for Edmondson being placed on contract and terminated from the SOP.

17

The SOP staff witnesses all testified unequivocally that confidentiality is the cornerstone of the SOP program, which relies on the inmates' full disclosures about sexual offenses they have committed or been the victim of, and other sensitive information.  It is crucial to the safety of the SOP participants in the prison as well as to the success of the program, that the confidentiality rules be scrupulously followed.  Edmondson signed a Program Contract on December 1, 2003 affirming that he would not disclose any information regarding any SOP participant to anyone outside of the program, and acknowledging his understanding that violating the terms of the Program Contract "will be grounds for termination from the program."  See Def. Ex. F.  Even Edmondson acknowledged in his own testimony that confidentiality and trust were the most important components of the SOP.

I find for purposes of making a recommendation on preliminary injunctive relief, that the Defendants have sufficiently demonstrated that Edmondson was placed on contract and ultimately terminated as a result of his own behavior in violating confidentiality and not due to his involvement in the Duquette lawsuit and his opposition to religious indoctrination

in the SOP program.  The testimony was, however, that Edmondson's involvement in the lawsuit and his conduct during that time caused a lot of disruption to the SOP and that Edmondson was found to be responsible for the disruption, and was held accountable for his disruptive and maladaptive behaviors.

While I believe that Edmondson testified truthfully at the hearing, in that he genuinely perceived that he was being retaliated against, attacked, and treated unfairly, I find that his beliefs regarding the reasons he was terminated from the SOP have more to do with what one witness called his "cognitive distortions" than with the actual reasons for his termination. Accordingly, I find that Edmondson has not demonstrated that he is likely to prove his retaliation claim on its merits.

The *sine qua non* of a preliminary injunction is the likelihood of success on the merits; the court may deny the motion if the movant does not show that it will probably succeed on its claims.  See Weaver v. Henderson, 984 F.2d 11, 12 & n.3 (1st Cir. 1993).  Because Edmondson has failed to demonstrate that he is likely to meet with success on the merits of his retaliation claim, I recommend that his request for a preliminary injunction be denied.

19

<u>Conclusion</u>

Any objections to this Report and Recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See <u>Unauthorized Practice of Law Comm. v. Gordon</u>, 979 F.2d 11, 13-14 (1st Cir. 1992); <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986).



_____
James R. Muirhead
United States Magistrate Judge

Date:  April 3, 2006

cc:    William Edmondson, *pro se*

20